UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

WILLIAM R. KERR,

          Petitioner,

          v.                              Case No. 04-C-1153

PHIL KINGSTON,

          Respondent.

## DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DISMISSING CASE

William Kerr filed this petition pursuant to 28 U.S.C. § 2254, asserting that his state court conviction and sentence were imposed in violation of the Constitution. Kerr was convicted in Milwaukee County Circuit Court of first degree intentional homicide and was sentenced to life imprisonment with a parole eligibility date of January 1, 2021. He is incarcerated at Waupun Correctional Institution, where respondent was the warden.[1]

Respondent answered the petition, admitting that Kerr's petition is neither time-barred nor a second or successive petition under 28 U.S.C. § 2244. (Answer ¶¶ 7, 8.) Thereafter, the parties briefed the issues presented and additional exhibits from the state court record were filed.

The petition asserted four grounds for relief: (1) violation of the privilege against self-incrimination; (2) ineffective assistance of trial counsel for failing to put forth the defenses of provocation, intoxication, and defense of others; (3) ineffective assistance of trial counsel

---

[1]It appears that Michael Thurmer is now the warden at Waupun Correctional Institution, but the court will not require amendment of the caption at this time.

for failing to conduct an adequate pretrial investigation; and (4) ineffective assistance of counsel resulting from failure to provide accurate information regarding the state's plea bargain offer. In his brief, Kerr transforms the first issue from a claimed violation of the privilege against self-incrimination to a claim of ineffective assistance of counsel for failure to raise the self-incrimination issue and for waiving a hearing on the matter. Kerr argues a fifth issue in his brief: (5) ineffective assistance of postconviction and appellate counsel for failure to assert on direct appeal that trial counsel was ineffective.

STANDARD OF REVIEW

A writ of habeas corpus may not be granted as to any claim that adjudicated on the merits in state court unless the decision on that claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" U.S. Supreme Court law or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" Supreme Court law if the state court arrived at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decided the case differently than the Supreme Court on facts that are materially indistinguishable. *Williams v. Taylor*, 529 U.S. 362, 405-06, 413 (2000). A state court decision is an "unreasonable application" of Supreme Court law if the state court identified the correct governing legal principle but applied that principle to the facts of the case unreasonably. *Id.* at 407-09, 413. A federal habeas court analyzing the "unreasonable application" prong "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. Further, a state court's fact determinations are presumed correct and a petitioner must rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

2

If the petitioner failed to develop the factual basis of a claim in state court, the district court may not hold an evidentiary hearing on the claims unless the petitioner shows that the claim (1) relies on a new rule of constitutional law made retroactive by the Supreme Court or a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

## LAW ON INEFFECTIVE ASSISTANCE OF COUNSEL

In his brief Kerr argues five instances of ineffective assistance of counsel. To establish ineffective assistance of counsel a petitioner must show both that counsel's performance was deficient, and that the petitioner was prejudiced as a result. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

For the performance prong of the *Strickland* test, the petitioner must establish that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The court must determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. *Strickland* permits a wide latitude of permissible attorney conduct. *See id.* at 689. The petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks deleted); *see also Washington v. Smith*, 219 F.3d 620, 627 (7th Cir. 2000). Judicial scrutiny is highly deferential and the court strongly presumes that counsel's conduct was reasonable.

3

*Strickland*, 466 U.S. at 689. Counsel's performance must be evaluated from his or her perspective at the time; hindsight should not distort the evaluation. *Id.*

To demonstrate prejudice a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Id.* at 697.

## FACTUAL BACKGROUND

The following facts regarding Kerr's crime and conviction for the most part are as set forth by Kerr in his brief to the Wisconsin Court of Appeals.

> At 12:54 a.m. on August 9, 1999, the Wauwatosa Police Department received a 911 call from 654 North 76th Street. A man identifying himself as William Kerr stated he had just shot a person at that address. Police responded at 12:56 a.m. and carefully approached the house. Mr. Kerr appeared in the doorway and was told to display his hands and step outside. He did so stating, "I did it. I shot the guy." Officer Zielinski asked, "what guy?" and Mr. Kerr stated, "I don't know his name, but the guy's having an affair with my wife." When asked where the gun was, Mr. Kerr responded, "It's in the house the .12 gauge shotgun." He also indicated his wife was still inside. Mr. Kerr was taken into custody.
> Meanwhile, other officers called Mrs. Kerr from the home and then entered, finding the deceased laying across two chairs next to the table in the kitchen. . . . After the house was deemed safe, Mrs. Kerr was brought back into the home and identified the deceased as Tony Graff.

(Answer, Ex. E at 3-4 (citations omitted).)

> Joan Kerr was the wife of William Kerr and lived with him at 654 N. 76th Street. She met Graff while bartending and began having an affair with him sometime in June, 1999. Joan saw Graff three to four times a week until his death. At some point Mr.

> Kerr began asking if she was seeing someone else. She denied
> she was. Nonetheless, Mr. Kerr was suspicious . . . .

(*Id.* at 5 (citations omitted).)

The day before the shooting, i.e., August 8, 1999, the Kerrs and another couple,

Audra Mieszkowski and Chris Brown, had arranged a joint trip to the Wisconsin State Fair.

(*Id.*)

> They met at the Kerr home and then went to the fair late morning.
> The evening before, Joan told Graff of their plans and he said he
> would arrange to be there with his son. Thus, around 3:00 p.m.,
> when Mr. Kerr and Brown went off to the midway, Joan called
> Graff on [her friend's] cell phone to find out where he was and
> then went to meet him at that location. . . . Joan talked to Graff
> about five minutes, hugged and kissed him good-bye, and then
> returned to the Midway. Meanwhile, Mr. Kerr and the two friends
> were looking for Joan. When Mr. Kerr found his wife he also saw
> Graff, who had followed her . . . .

(*Id.* at 5-6 (citations omitted).)

The Kerr group left the State Fair. They had been drinking during the afternoon

and stopped to purchase more alcohol. After returning to the Kerr's residence, the friends

stayed a while then left around 6:00 p.m. (*Id.* at 6.) Because of her intoxication, Joan Kerr

could not remember a great deal about what occurred after that. She knew she and Graff

talked on the telephone two or three times that evening; she had told Graff her husband had

struck her and Graff said he was coming to get her to take her to his residence for the night.

(*Id.*)

Kerr and his wife continued to drink that evening. The phone rang and when

Kerr answered, a man asked for Joan. (*Id.* at 8.) The phone rang again and the man on the

line said "'I was close enough today to slit your throat" and that Kerr should not hit his wife.

In a third call the man said he was going to "'blow [Kerr's] brains out.'" (*Id.* at 9.) After the last

5

call Kerr checked the phone bill for Joan's cell phone and found two numbers he did not recognize. He called one and the man's son said his father was on his way to Kerr's house. Kerr then went and loaded his shotgun. (*Id.*)

After a few more phone calls between Graff and Kerr, Kerr entered his kitchen and saw Graff coming in the back door and saying they needed to talk. (*Id.*) Then, Kerr spotted a light outside the back door as Graff sat down at the kitchen table. (*Id.*)

Meanwhile, a neighbor had called the police about a prowler walking up the driveway between 660 N. 76th Street and Kerr's house. As an officer walked up Kerr's driveway checking for the prowler, Kerr came out of the house. The police officer described the possible prowler and Kerr reported that it was a friend of his who had just arrived and was now inside. The officer noticed that Kerr had been drinking and believed he was intoxicated. (*Id.* at 4.) At 12:51 a.m. the officer departed the scene. (*Id.* at 4-5.)

Kerr testified that after he reentered the house, he had the following conversation with Graff:

> "I asked him what was the problem. And that's when he told me, 'I'm your fucking problem, I'm going to take your wife and you're not going to stop me.' And I said, 'Over my dead body.' And he said, 'That will be easy enough.' As he got up, I reached over, grabbed the gun and shot him."

(*Id.* at 10.) Kerr then called 911 and reported shooting someone. He said he thought Graff was going to kill him because of Graff's threats that evening. (*Id.*)

Following Kerr's 911 call, the police approached the house from the front in a "tactical fashion." (Answer, Ex. V at 11.) According to Kerr, the police officers had their guns

drawn.  (Br. in Supp. at 7.[2])  They ordered Kerr to show his hands and to move to the middle of the front yard, where Kerr was handcuffed and frisked.  (*Id.*)  However, no *Miranda*[3] warnings were given at that time.  (Br. in Supp. at 7.)  As Kerr walked to the middle of the yard one of the officers asked him what was going on, to which Kerr responded:  "I did it, I shot the guy."  (Answer, Ex. V at 89.)

Kerr was placed in a squad car and driven to the police station.  (*Id.* at 90-91.) Either along the way or at the police station Kerr asked to be given a blood test and repeated the request several times.  (Br. in Supp. at 7; Answer, Ex. V at 91.)  According to an officer, Kerr also stated:  "'You're messing with my life, this could be the difference between life in prison and five years."  (Answer, Ex. V at 91.)

Kerr's blood alcohol level was tested at 4:30 a.m. and registered 0.218 at that time.  An expert, extrapolating back to 12:30 a.m., indicated that Kerr's blood alcohol level at that time would have been about 0.238.  (Answer, Ex. E at 10; Ex. W at 99-100.)

PROCEDURAL HISTORY

Kerr was represented by attorneys Gerald and Bridget Boyle before Milwaukee County Circuit Court Judge John J. DiMotto.  At trial, police officers testified to Kerr's statements upon exiting the house and his requests for a blood test.  (*See, e.g.*, Answer, Ex. V at 89, 91.)  Graff's twelve-year-old son, Ryan, testified about his visit to the State Fair on August 8, 1999, and to his father's phone calls afterward.  Ryan noted that after a phone call, Graff told Ryan that Joan indicated that Kerr said he wanted to put a bullet in Graff's head.

---

[2]Kerr argues in his brief that guns were drawn, but his citations to the record do not confirm that they were drawn at any time before the officers entered the house.

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Graff also told Ryan that he had called Kerr's house three times and had confronted Kerr on the phone. At some point Graff went to the Kerrs' home. Kerr called Graff's home, and spoke with Ryan who informed him that his father was on his way to the Kerrs' house. (Answer, Ex. E at 7.) Ryan's testimony about the bullet-in-the-head statement was admitted as impeachment evidence against Joan, who testified that she never made such a statement to Graff. (*See* Answer, Ex. U at 36-37, 41-42, Ex. V at 153.)

The jury was instructed on first-degree intentional homicide, second-degree intentional homicide, first-degree reckless homicide, and second-degree reckless homicide, all while armed, plus self-defense. The jury found Kerr guilty of first-degree intentional homicide. (Answer, Ex. E at 10-11.) Kerr was sentenced on January 20, 2000, to life imprisonment with a parole eligibility date of January 1, 2021.

Trial counsel filed a post-trial motion, arguing insufficient evidence and that the parole eligibility date imposed by the court was unduly harsh. The trial court denied the motion on June 15, 2000, and a notice of appeal was filed. Meanwhile, Kerr switched attorneys; new counsel was appointed, the notice of appeal was dismissed, and the Wisconsin Court of Appeals reinstated Kerr's case at the post-trial stage so he could file additional motions. Kerr filed a second post-trial motion, arguing that a new trial should be held because the jury was not instructed on homicide by intoxicated use of a firearm. The trial court denied the motion on December 27, 2000.

Kerr appealed his conviction and the denials of the post-trial motions to the Wisconsin Court of Appeals, which affirmed. He sought review in the Wisconsin Supreme Court, but the request was denied on July 26, 2002.

On June 30, 2003, Kerr filed a motion under Wis. Stat. § 974.06, in which he argued that the statements he made to police were used at trial in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that his attorney was ineffective for not objecting; that his attorneys were ineffective for failing to assert certain defenses at trial; that his trial lawyers were not sufficiently diligent in investigating and preparing for trial; and that his attorneys gave him erroneous advice regarding a plea agreement deal. The motion was denied on the merits by Milwaukee County Circuit Court Judge Richard J. Sankovitz on August 4, 2003. The Wisconsin Court of Appeals affirmed the denial on September 15, 2004, noting that Kerr's arguments could have been barred by *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 181 (1994). However, the court stated that "because the circuit court addressed the merits of Kerr's motion, and the State has addressed them, we too will consider the merits." (Answer, Ex. P at 3.) The Wisconsin Court of Appeals then addressed in two short paragraphs Kerr's *Miranda* claim and his claim that trial counsel did not adequately investigate and prepare for trial. (*Id.* at 3-4.) Kerr's request for review by the Wisconsin Supreme Court was denied on November 17, 2004. (Answer, Ex. S.)

Meanwhile, Kerr filed a *Knight* petition[4] on a claim of ineffective assistance of appellate counsel. The Wisconsin Court of Appeals denied the petition in a decision dated June 10, 2004. (Pet., App. Doc. 4.) Again, the Wisconsin Supreme Court rejected Kerr's request for review. (See Pet., App. Doc. 6 (denied August 2, 2004).)

---

[4]*See State v. Knight*, 168 Wis. 2d 509 (1992).

9

The *Knight* petition asserted a claim that Kerr's privilege against self-incrimination was violated by the use of statements made before he was given *Miranda* warnings. (Pet. at 7.) Kerr maintained that his statements were made in response to questions by police officers and that the judge never asked or investigated whether the responses he gave violated his privilege against self-incrimination. (*Id.*) In his brief, Kerr identifies two sets of statements at issue – those made to police officers when they arrived on the scene and those made on the way to or at the police station about a blood test and why he wanted it.

Infringement of the privilege against self-incrimination is a constitutional ground for relief. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Because of the inherent pressures of custodial interrogation, the prosecution may not use statements obtained during custodial interrogation unless it demonstrates the use of procedural safeguards for the suspect's privilege against self-incrimination. *Id.* at 444, 478-79; *see id.* at 467.[5] "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Thus, a suspect must be in custody and be questioned for *Miranda* to apply. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

The test for determining whether a person is in custody is an objective one. *Stansbury v. California*, 511 U.S. 318, 323 (1994). The ultimate inquiry is whether there was a formal arrest or restraint of movement to a degree similar to a formal arrest. *Id.* at 322.

---

[5]Such procedural safeguards include the well-known warnings that the person has a right to remain silent, that any statement made can be used as evidence against the person, and that the person has the right to the presence of counsel. *Id.* at 444, 467-73, 479.

Factors to be considered include whether and to what extent a suspect has been made aware that he is free to refrain from answering questions; whether there has been prolonged, coercive, and accusatory questioning or police subterfuge to induce self-incrimination; the degree of police control over the environment in which the interrogation takes place, in particular whether the suspect's freedom of movement is physically restrained; and whether the suspect could reasonably believe that he has a right to leave. *See Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996).

Generally, a person questioned at his home is found not to be in a custodial setting, *see Beckwith v. United States*, 425 U.S. 341, 342-44, 347 (1976), unless the police dominate the scene and restrain the person significantly, *see Sprosty*, 79 F.3d at 641-43. Further, questioning an individual near the scene of a crime does not rise to the level of a custodial setting. *Miranda*, 384 U.S. at 477 ("General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding."); *see Borodine v. Douzanis*, 592 F.2d 1202, 1205-08 (1st Cir. 1979). An officer called to the scene of a crime about which he knows nothing can attempt to find out what happened without violating *Miranda*. *See Borodine*, 592 F.2d at 1207.

Moreover, the use of voluntary statements does not violate *Miranda*. *Miranda*, 384 U.S. at 478 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."); *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007). Interrogation for purposes of *Miranda* warnings occurs only as to "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444. The Court has indicated that "interrogation" under *Miranda* includes "either

11

express questioning or its functional equivalent," *Innis,* 446 U.S. at 300-01, the latter meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnotes omitted).

The unarmed defendant in *Innis* was arrested for a murder involving a shotgun and placed in a patrol car with three officers. During the drive to the police station two of the officers discuss their concern that there was a school for disabled children nearby and that children could find a weapon and hurt themselves. The defendant interrupted their conversation and said he would show the police officers where the gun was located. Then, he led them to the gun. *Id.* at 293-95. The Court found that no interrogation occurred. *Id.* at 302. The entire conversation consisted of just a few remarks, the comments were not particularly evocative, and nothing suggested that officers were aware that Innis was susceptible to an appeal to his conscience; thus the officers should not have known their comments were likely to elicit an incriminating response. *Id.* at 302-03.

In Kerr's case, brief questioning occurred as police arrived at Kerr's home in response to a 911 call. The officers observed Kerr as he exited the home, ordered him to raise his hands and directed him to the middle of the yard. While walking with Kerr toward the middle of the yard, an investigating officer asked what was going on and Kerr responded. At some point after reaching the middle of the yard, Kerr was frisked and handcuffed. While Kerr might not have been free to leave, it is significant that he was at his home, when he was asked what had happened and that he had not been handcuffed at the time. This sequence of events supports the conclusion that Kerr was not in custody. Although Kerr asserts that officers had their guns drawn at the time they approached the house, he failed to point to any

12

trial evidence supporting this contention. Moreover, Kerr was being asked quick, on-the-scene, fact-finding questions, and such questions do not constitute custodial interrogation. *See Miranda*, 384 U.S. at 477. Officers responding to an emergency call are allowed to inquire about what prompted the 911 dispatcher to inquire about a gun that may have been involved was without violating *Miranda*. Therefore, even under de novo review Kerr's claim would fail.

Kerr's custodial interrogation claim certainly fails under deferential review. The Wisconsin Court of Appeals cited *Miranda* and found that the initial statements that were given to arriving police officers, "were not made while Kerr was in police custody or in response to police questioning. Kerr's responses to initial inquiries when police arrived at the scene were made before Kerr was placed in custody." (Answer, Ex. P at 4.) That decision was not contrary to Supreme Court precedent, nor was it an unreasonable application of Supreme Court law. The Wisconsin Court of Appeals applied *Miranda* and its application was reasonable under the circumstances of this case. Nor did the Wisconsin Court of Appeals base its decision on an unreasonable determination of the facts in light of the evidence presented at trial.

Kerr's statements to officers on the way to or at the police station about a blood test were voluntary. He does not argue that his demands for a blood test were in response to any police questioning. Although he argues in his brief that the statement about the difference between five years and life was made in response an officer's question (Br. in Supp. at 7), his citations to the record do not support a finding that such a question was posed. When the prosecutor warned the court and the defense that he was going to use these statements, he represented that Kerr approached the police and said voluntarily that

he wanted a blood test and that it meant the difference between five years and life. (Answer, Ex. U at 47.) Defense counsel did not dispute that representation and discussed the matter with his client. (*Id.* at 47, 49.) Then, counsel and Kerr reaffirmed that Kerr volunteered the statements. (*Id.* at 49-50.) During his testimony, Kerr confirmed that he told the officers that he wanted a blood test and that it could make a difference between five years and life. (Answer, Ex. W at 195, 216.) The officer to whom Kerr spoke indicated that Kerr said he wanted to be taken to Froedtert Hospital for a blood draw because it could be the difference between life in prison and five years. (Answer, Ex. V at 91.) Kerr provides no citation to any evidence indicating that the comment about the penalty was in response to a police question. As a result, the situation was much like that in *Innis* and the voluntary statements were admitted properly.

In his brief, Kerr modified this claim to assert ineffective assistance of counsel for failure to challenge the use of these statements. This court need not decide whether Kerr can alter his claim between the filing of his petition and brief, as counsel cannot be ineffective for and Kerr cannot have suffered prejudice from the failure to raise a claim that would not have succeeded. Further, the failure to challenge both sets of Kerr's statements at trial was a tactical decision. Counsel stated on the record, outside the presence of the jury, that Kerr "did himself go up and say that to the police. And it was voluntary, and therefore there is no way I'm going to keep it out via *Miranda-Goodchild*." (Answer, Ex. U at 49.) Also, counsel added that he had considered whether Kerr's on-scene statements should be challenged and determined that he could not prevail on that issue. (*Id.* at 50-51.) Hence, this court concludes that counsel's tactical decision not to bring challenges with likelihood of success was reasonable and was not deficient in any way.

14

REMAINING FOUR INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

In his petition Kerr asserts that his attorney was ineffective for three reasons: (1) failing to investigate and put forth the defenses of adequate provocation, intoxication, and defense of others; (2) failing to conduct an adequate pretrial investigation; and (3) giving him inaccurate information regarding the state's plea bargain offer. Kerr's brief adds a claim of ineffective assistance of appellate counsel.

1.    Defenses

Intoxication, adequate provocation, and defense of others are legal defenses. *See* Wis. Stat. §§ 939.41, .44, .48 (1997-1998); Wis. JI-Criminal 700, 1012.[6] For an instruction on a legal defense to be made it must be supported by the evidence and not adequately covered by other instructions in the case. Wis. JI-Criminal 700. "The most useful test [for sufficient supporting evidence] may be to ask whether there is enough evidence of a defense to generate a jury issue on its existence or nonexistence." *Id.*

The Circuit Court was the last state court to address the merits of Kerr's claim that his attorney was ineffective for not pressing the intoxication, adequate provocation, and defense of others issues. After doing so, it denied Kerr relief under Wis. Stat. § 974.06 motion. The Circuit Court found no evidentiary basis for instructing the jury about these defenses "and that, in any event, the instructions given allowed the jury to consider Mr. Kerr's arguments in deciding whether to acquit him or convict him of first degree intentional homicide or of one of three lesser-included offenses." (Answer, Ex. M at 5.) Thus, without saying so

---

[6]Wisconsin's pattern criminal jury instructions can be considered persuasive regarding Wisconsin law. *See State v. Mueller*, 201 Wis. 2d 121, 145 (Ct. App. 1996).

expressly, the court found that trial counsel was not deficient for pursuing these defenses and that Kerr suffered no prejudice.

      a.     Intoxication

Kerr argues that his attorney failed to present his blood alcohol test, police reports from the friends who went with him to State Fair saying that Kerr had been drinking heavily and was intoxicated, a neighbor's statement that he (Kerr) was slightly intoxicated, and arresting officer statements that if he (Kerr) had attempted to drive his vehicle the officer would have conducted a field sobriety test. According to Kerr, he did not get the police reports until after his direct appeal was close to completion. He argues that if the jury had heard all of this evidence it could have concluded that he was intoxicated enough to negate the existence of the state of mind essential to the crime. Further, Kerr maintains counsel should have produced a medical expert on intoxication and impairment and argued that he could not have had the intent necessary for the crimes charged.

Voluntary intoxication is a defense to a crime if the condition negates "the existence of a state of mind essential to the crime." Wis. Stat. § 939.42(2) (1997-1998). A defendant must have been "so intoxicated" that he could not have intended to kill. *See* Wis. JI- Criminal 765. To merit an intoxication instruction, the defendant

> must come forward with some evidence of the degree of intoxication which constitutes the defense. An abundance of evidence which does not meet the legal standard for the defense will not suffice. There must be some evidence that the defendant's mental faculties were so overcome by intoxicants that he was incapable of forming the intent requisite to the commission of the crime. A bald statement that the defendant had been drinking or was drunk is insufficient – insufficient not because it falls short of the quantum of evidence necessary, but because it is not evidence of the right thing.

*State v. Strege*, 116 Wis. 2d 477, 486 (1984).

The trial evidence included evidence that Kerr had been drinking. However, it also included plenty of evidence that Kerr was lucid and not excessively intoxicated. One officer testified that Kerr did not seem to have difficulty walking across the porch minutes after the shooting. (Answer, Ex. V at 42.) Another testified that when he talked with Kerr at the back door about a prowler, and again after officers responded to the shooting, Kerr appeared calm, rational, and relaxed, and that although the officer noticed Kerr had been drinking, Kerr appeared coherent and alert, without any slurred speech or balance problems. (*Id.* at 85, 90, 93.) Kerr testified that he was calm and collected when telling the officers at the scene that he shot Graff. (Answer, Ex. W at 214.) Audra Mieszkowski testified that she had no fear of driving with Kerr back to his house after State Fair due to any concern that he had too much to drink. (Answer, Ex. V at 243.) Chris Brown testified that Kerr had no trouble driving home from State Fair and that Kerr has a high tolerance for alcohol. (Answer, Ex. W at 19, 41-42, 49.) Kerr testified that upon learning that Graff was headed to his house he loaded his shotgun and had it ready to fire (*id.* at 179, 181, 210), indicating that he was able to think and plan. Moreover, Kerr had the presence of mind to call 911 to report the shooting and said he knew what he had done. (*See id.* at 194, 195.) He asked for a blood test not to show how intoxicated he was (*id.* at 216-17) but instead so police would know he was not taking hallucinogenic drugs "or anything like that to make me do something crazy" (*id.* at 195). In light of this evidence, counsels' failure to argue an intoxication defense was not objectively unreasonable or outside the wide range of professionally competent assistance, as substantial evidence indicated Kerr was not so intoxicated that he could not have intended to kill.

17

Further, the sealed portion of the sentencing transcript indicates that counsel considered but rejected an intoxication defense. Counsel stated:

> I explained to him the why, showing him the facts of his conduct, how he sounded on the phone, how he was able to go right to 911, what he said to the officers, how he earlier appeared to the officers, how he appeared to the officers at the station house, went and asked for a Breathalyzer. I said that's not an involuntary defense that's going to survive. And I said, I don't think that it's there for me to proffer to a jury or court.

(Sealed Sent'g Tr. at 39.) In light of this record, Kerr is unable to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks deleted).

In addition, Kerr cannot demonstrate prejudice from counsels' failure to proffer the defense or the evidence described above. The jury heard testimony that it could have considered regarding Kerr's ability to form intent. There was testimony concerning the blood alcohol test, one officer's thought that he would have given a field sobriety test if Kerr tried to drive, and there was testimony concerning Kerr's drinking before, at, and after State Fair. (Answer, Ex. V at 220, 236, 246, Ex. W at 17, 18, 43-44, 154, 158, 164, 167, 169, 183.) Additional police reports (if admissible) would have added little.

Because Kerr's claim of ineffective assistance of counsel also fails regarding this defense under a de novo review, denial of this claim by the state court was not an unreasonable application of federal law.

     b.    Adequate Provocation

Adequate provocation is another defense to first-degree intentional homicide. *See* Wis. Stat. §§ 939.44, 940.01(2)(a) (1997-1998); Wis. JI-Criminal 1012. Adequate

provocation mitigates the offense to second-degree intentional homicide. Wis. Stat. §§ 939.44(2), 940.01(2)(a) (1997-1998).

> "Provocation" means something the defendant reasonably believes the intended victim had done which causes the defendant to lose self-control completely at the time of causing death. This requires that the defendant actually believed that there was provocation and that the defendant's belief was reasonable.
> "Adequate" provocation means sufficient provocation to cause complete loss of self-control in an ordinary person.
> "Complete loss of self-control" is an extreme mental disturbance or emotional state. It is a state in which a person's ability to exercise judgment is overcome to the extent that the person acts uncontrollably. It is the highest degree of anger, rage, or exasperation.
> . . . .
> The standard is what a person of ordinary intelligence and prudence would have believed and whether that person would have completely lost self-control under the same circumstances.

Wis. JI-Criminal 1012 (footnotes omitted); *accord* Wis. Stat. § 939.44(1) (1997-1998).

The circuit court determined that "[n]o reasonable interpretation of the evidence would lead to the conclusion that Mr. Kerr completely lost self-control" (Answer, Ex. M at 7) such that this was a plausible defense that counsel should have argued. This court agrees.

Kerr testified that Graff stepped in through his back door and said the two had to talk, and Kerr motioned Graff to a chair. (Answer, Ex. W at 188.) Then, Kerr calmly told the police officers investigating a prowler that the man was a friend of his. When asked why he did not report any of Graff's threats on the telephone to police when they came to his door, Kerr stated that it was because Graff "didn't seem threatening. He said he wanted to talk. I wanted to talk. I wanted to know what was going on." (*Id.* at 189.) Kerr added that nevertheless he stood by the shotgun after talking with the police. According to Kerr, after the police completed their prowler investigation, he had the following exchange with Graff:

19

> I asked him what was the problem. And that's when he told me, "I'm your fucking problem, I'm going to take your wife and you're not going to stop me." And I said, "Over my dead body." And he said, "That will be easy enough." As he got up, I reached over, grabbed the gun and shot him.

(Answer, Ex. W at 191.) Graff was only about a foot and a half from the chair where he had been seated when Kerr shot him. (*Id.* at 192.) And, at not time did Kerr see Graff with a weapon. (*See id.* at 194.)

These facts do not show a high degree of exasperation, rage, or anger. As mentioned above regarding the intoxication issue, Kerr was calm just moments before shooting Graff, and their verbal exchange was not such that it could reasonably have been considered adequate provocation for Kerr's action. Again, the circuit court was correct that counsel was not ineffective for not arguing this defense, and its ruling was consistent with federal law.

c.    Defense of Others

Defense of others is a valid defense when the defendant reasonably believed (1) there was an actual or imminent unlawful interference with another person, (2) the other person was entitled to use or threaten force in self-defense, and (3) the amount of force used by the defendant was necessary for the protection of the other person. Wis. JI-Criminal 830; *see* Wis. Stat. § 939.48 (1997-1998).

The circuit court found that Kerr had developed his argument insufficiently and had failed to suggest how Joan Kerr was subject to any unlawful interference. The circuit court noted Kerr's testimony that Graff threatened to take Joan with him, but also recognized the evidence of an affair between Joan and Graff, and Graff's possible perception that Kerr had hit Joan earlier in the evening. The circuit court concluded that there was no "real issue

for the jury to decide regarding whether Graff subjected Joan Kerr to some actual threat of unlawful interference with her person, or that she would not have welcomed his initiative." (Answer, Ex. M at 9.) Thus, without saying so expressly, the circuit court found that counsel was not ineffective for failing to argue this defense considering the lack of supporting evidence.

The only bases for a defense-of-others claim was Graff's statement that he was going to take Kerr's wife away and Graff's rising up from his seat. However, no reasonable person, under the circumstances, would have seen these occurrences as actual or imminent unlawful interference with Joan Kerr's person. Kerr knew Graff and Joan had been having an affair and that Joan had met Graff at State Fair willingly and had talked with Graff on the telephone. Moreover, while in Kerr's home, Graff was seated while Joan apparently was elsewhere in the kitchen (i.e., not under Graff's physical control). As a consequence, the defense of others defense was weak, at best, and counsel was not deficient for failing to present it. Further, Kerr cannot establish that had the defense been presented his trial would have ended differently, as any reasonable jury would have rejected the defense without much deliberation.

2.    Failure to Investigate

In support of his failure to investigate claim, Kerr contends that counsel neglected to: (1) interview Joan Kerr, the owners of Weidland's landing, Bradley Jones (who talked to Graff before he left for the Kerrs' house), the Rickheims and their son (Graff's neighbors, who talked with Graff before he left for the Kerrs' house), Ryan Graff, and Pewaukee police officer Evans (who questioned Ryan Graff about whether he was aware of the shotgun on Graff's couch); (2) file pretrial motions (in particular a motion to suppress

statements based on the asserted *Miranda* violation) or request the state's witness list and discovery; (3) file his own witness list; (4) oppose the state's motion in limine; (5) obtain phone records; and (6) prepare for argument against the state's use of hearsay.

The Wisconsin Court of Appeals addressed this issue in one paragraph, as follows:

> Kerr also contended that trial counsel did not adequately investigate and prepare for trial. An assertion that trial counsel did not conduct an adequate pretrial investigation fails unless the defendant also asserts "a factual basis for the opinion" that the investigation was inadequate. We agree with the circuit court's assessment that Kerr "only offers speculation as to what [additional investigation and preparation] might have produced." Therefore, that aspect of Kerr's postconviction motion was properly denied without a hearing.

(Answer, Ex. P at 4.) Respondent does not argue that Kerr procedurally defaulted the present version of this claim by presenting more detailed argument here than he did before the state courts.[7]

Regarding most witnesses referenced above, Kerr submits that defense counsel could have brought to light more evidence of Graff's possible intoxication and "stalking" of Joan and Kerr – apparently Graff followed the Kerrs when they went on a camping trip in July 1999, and Kerr wanted to show that in addition to testimony describing the contact Graff initiated with the Kerrs the night he died. Regarding Ryan Graff, Kerr's argument is that defense counsel could have brought to light impeachment evidence. However, Kerr proffers no specific evidence that would have been brought forth – for instance, as to the owners of Weidland's landing, he states that counsel might have uncovered "any threats or possible

---

[7]For the most part, respondent's brief is unhelpful, as it mainly block-quotes the pertinent state court opinions (copies of which were already attached to the petition and answer) and then concludes without analysis that Kerr has shown nothing indicating such decisions were contrary to or an unreasonable application of Supreme Court law.

exculpatory or impeachment evidence." (Br. in Supp. at 14.) But, inasmuch as the evidence that might have been uncovered is speculative, the court cannot find that Kerr suffered any prejudice.

Kerr does not qualify for an evidentiary hearing in this court, as he does not rely on any new rule of constitutional law or factual predicate that could not have been discovered previously through the exercise of due diligence, nor does he establish that the facts he would show would be sufficient to establish by clear and convincing proof that but for constitutional error, no reasonable fact-finder would have found him guilty of the underlying offense. *See* 28 U.S.C. § 2254(e)(2). Earlier, Kerr filed a motion for an evidentiary hearing, which this court denied without prejudice and indicated it would consider in connection with Kerr's petition. Kerr contended that he exercised diligence in seeking a hearing in state court by asking the circuit court for a hearing on his § 974.06 motion. However, Kerr said, the state court's twenty-page limit on § 974.06 motions prevented him from sufficiently convincing the state court to hold a hearing.

This court is unconvinced that a twenty-page limit for a brief can be blamed for Kerr's failure to get facts before the state court. Twenty pages are plenty. If Kerr failed to present enough discussion on proposed pertinent testimony to the state court to obtain a hearing, the failure must be attributed to him.

Failure to file a *Miranda* motion has already been addressed. Regarding the failure of counsel to obtain a witness list, to secure certain discovery or to file a defense witness list, Kerr does not show how the proceedings would have differed, and does not show that he was prejudiced. He fails to demonstrate that any of the witnesses the state called at trial was a surprise to defense counsel or that counsel was unaware of key evidence that was

available in discovery. Moreover, he does not establish that defense counsel was unable to call any particular witnesses because a witness list was not filed before trial.

Kerr contends that Graff's bad character was an essential part of his defense and that the court should have allowed into evidence Joan Kerr's statement to Chris Brown that Graff was very persistent and would not leave her alone; that Graff once went to Kerr's place of employment to watch him at work; that Graff had used aliases; that Graff had at least two criminal charges as well as a marijuana conviction. However, Kerr has not identified what his counsel did defectively in opposing the state's motion in limine regarding such matters. In his brief, Kerr asserts that the *judge* denied him the right to have witnesses testify about Graff's stalking, faults the *judge* for not stating sufficient reasons for his ruling on the record, and submits that "counsel should be made to explai[n] his strategic or tactical reason for allowing the motion in Limine to be granted." (Br. in Supp. at 18-20.) But, Kerr neglects to point to what his attorney could have argued that would have changed the judge's mind. According to the transcript, a discussion was held in chambers regarding the motion in limine, and the discussion was not transcribed. (Answer, Ex. U at 19.) From the transcript following the discussion it appears that defense counsel agreed they did not have any "legitimate other acts evidence" under Wis. Stat. § 904.04. (*Id.* at 19-20.) Also, Kerr has not shown this court how counsel's assessment regarding character evidence was wrong or that he knew any of this "bad character" evidence in advance of killing Graff, thereby giving rise to his state of mind the night that Graf was killed.

Kerr argues that phone records would have shown that Ryan Graff testified falsely about Kerr knowing Graff was going over to the Kerrs' house; that Graff returned to his home to leave his gun behind before going to the Kerrs' house; and that Graff called the Kerrs

from a payphone just prior to entering their house, prompting Kerr to load his gun. Whether Graff had a gun that he left at home before going to the Kerrs' house, whether Kerr loaded his gun after one phone call from Graff, and whether Graff called the Kerrs more times than Ryan Graff noted are immaterial as to what actually happened in the Kerrs' kitchen. Inconsistences in the twelve-year-old's testimony likely would not have drawn the rest of his testimony into question. As a consequence, this court sees no possible prejudice from counsel's failure to obtain phone records or to proffer them as evidence.

Finally, Kerr argues that counsel inadequately prepared their objection to Ryan Graff's testimony that his father, before leaving their house to go to the Kerrs', told Ryan that Joan Kerr stated that Kerr had said he would put a bullet in Graff's head. Kerr contends that he never made such a statement, that Joan Kerr never made such a statement, and that the judge improperly allowed the state to present Ryan's testimony on this point. According to Kerr, the danger of unfair prejudice was great.

Again, Kerr's argument runs to the judge's ruling, rather than counsels' conduct. The record shows that defense counsel argued against the state's use of the statement. Before trial began, Gerald Boyle contended:

> That he [Graff] came out of the bedroom and remarked to the boy that Joan had told him, the deceased, that Bill quote "wanted to kick my butt, put a bullet hole in my head" unquote. That obviously can't get in. That is blatant hearsay.

(Answer, Ex. U at 22-23.) Thereafter, the trial judge indicated that the state first had to ask Joan Kerr whether she conveyed such a threat to Graff. (*Id.* at 36-37.) Then, the judge asked defense counsel for his position on Ryan Graff "being the vehicle to impeach her." (*Id.* at 37.) Boyle responded:

> I have to say that in all the years that I've been doing this I've never seen impeachment done by a party remote. In other words, I recognize that Mr. Graff is deceased, but I have no way of cross-examining the impeaching witness. And what we have then, Judge, is some diminution of . . . Mr. Kerr's right to claim self-defense, what with the fact that he is the one who is creating the threat that resolves itself. And I don't have any way of cross-examining – I don't know what Miss Kerr is going to say. . . . But my guess is she'll say she did not make such a statement. Now I have an impeaching witness that I can't really cross-examine because the impeaching witness is deceased.

(*Id.* at 37-38.) The judge approved Ryan's testimony about the statement of his father relaying Joan's message, to be used for impeachment of Joan if she denied making the statement, finding that the relay of the statement from Graff to Ryan was a present sense impression in which Graff was verbalizing his state of mind. (*Id.* at 36-37, 41-42.)

Regardless of whether the judge's ruling was right or wrong, Kerr fails to indicate what his attorneys should have argued differently. Therefore, he cannot establish any deficiency.

In sum, regarding all of the investigation and preparation failures Kerr attributes to counsel, the court finds no ineffective assistance even under a de novo standard. Certainly, under the deferential standard for state court decisions, this claim fails.

3.    Advice Regarding Plea Deal

Kerr asserts facts regarding this claim that he did not raise in his § 974.06 motion, namely that counsel told him the wrong penalty for the first-degree reckless homicide plea offered by the prosecution right before trial. (*See* Answer, Ex. L at 18.) In circuit court, Kerr's argument was different – he maintained that his lawyer overestimated the strength of his self-defense claim, failed to explain to him how a jury would consider evidence that the victim was unarmed, and failed to explain the difference between first-degree intentional

26

homicide and first-degree reckless homicide. (*Id.*) Because the respondent has not argued procedural default for failure to present the present version of the argument to the state courts, the court will address this claim.

According to Kerr, right before trial the prosecutor offered a deal for first-degree reckless homicide, a class B felony with a sentence range of zero to forty years.[8] Kerr swears in an affidavit that his attorneys informed him that the penalty for first-degree reckless homicide was life, with a statutory minimum of thirteen years. (Br. in Supp., App. 81; *see* Br. in Supp. at 24.) Indeed, in chambers after the sentencing hearing, Gerald Boyle stated, talking to Kerr: "[Y]ou now understand that we really had no offer other than the possibility of your pleading to life imprisonment with a 13 – with a statutory minimum." (Sealed Sent'g Tr. at 43.) Moreover, says Kerr, counsel failed to tell him that in accepting a plea and at sentencing the court would consider various facts, which he thinks were in his favor. (Br. in Supp. at 25.) Kerr swears that had he known the correct range he would have accepted the prosecution's offer. (Br. In Supp., App. 81 (Kerr Affidavit).

The *Strickland* test applies to counsel's advice during the plea process. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985). At a minimum, counsel must inform the client of a plea offered by the prosecution and allow the defendant to be involved in the decision-making process regarding acceptance or rejection. *United States v. Golden*, 102 F.3d 936, 943 (7th Cir. 1996); *Johnson v. Duckworth*, 793 F.2d 898, 902 (7th Cir. 1986).

---

[8]Kerr initially wrote that the sentence range was ten to forty years, but he filed a supplement to his brief in which he corrected the range. *See* Wis. Stat. § 939.50(3)(b) (1997-1998) (stating that the penalty for a class B felony was, at the time Graff was killed, up to forty years of imprisonment).

Assuming that Kerr's accusations are right,[9] counsel gave him inaccurate information regarding the possible sentence had he taken the plea deal. However, although accurate information is desired, the court is not persuaded that under *Strickland's* standard counsel's overall performance in advising Kerr about the plea offer was deficient. Kerr admits that he was told about the offer and discussed it with his attorneys. As Kerr's § 974.06 motion confirms, counsel discussed with Kerr the strength of his defense. And the sentencing transcript confirms that Kerr was involved in the decision to reject the plea. Attorney Gerald Boyle stated on the record, talking to Kerr: "[W]hen I brought that [plea offer] to you, I told you if there was any possibility at all, that was it. And you told me you would not do that." (Sealed Sent'g Tr. at 43.)

More significantly, the court is unpersuaded that Kerr suffered prejudice from his attorney's alleged misinformation. First-degree intentional homicide, a class A felony, carried a mandatory life sentence. Wis. Stat. §§ 939.50(3)(a), 940.01 (1997-1999). Judge DiMotto set the minimum time to be served before parole at about twenty-one years. Had Kerr pled to a class B felony, he could have received a sentence of up to forty years. Wis. Stat. § 939.50(3)(b). In the event he received a forty year sentence, he would have had a presumptive mandatory release date in approximately twenty-seven years. *See* Wis. Stat. § 302.11(1), (1g) (2005-2006). Any sentence of thirty years or more would have resulted in at least twenty years of incarceration before a presumptive mandatory release. *See id.* And such presumptive mandatory release could have been rejected by the parole board for a couple of reasons. *See* § 302.11(1g)(b) (2005-2006). Thus, there was a significant possibility

---

[9]It is possible that Boyle during the sentencing hearing was mistaken regarding what he had told Kerr at the time of the plea offer.

28

that Kerr could have been sentenced to a term of imprisonment which would have kept him in custody for a period similar to his present sentence. Moreover, Kerr was about forty years old at the time of conviction. A thirty or forty year sentence to a forty year old is not significantly different than a life sentence. Thus, the court is unpersuaded that, objectively, the difference in penalty would have been the determinative factor in accepting or rejecting the plea offer.

Further, the record does not support a finding of prejudice respecting counsel's advice concerning a plea offer. Kerr provides an affidavit stating that he would have taken the prosecutor's deal had he known the true penalty for the class B felony (Br. in Supp., App. 81). The court has reason to believe that this statement is colored by Kerr's present-day knowledge that he was convicted by the jury and sentenced to life. In *Toro v. Fairman*, the Seventh Circuit found that a petitioner's statement that he "would have been insane not to accept the plea agreement for the minimum sentence" failed to establish that counsel's incompetent advice regarding a plea deal prejudiced the petitioner. 940 F.2d 1065, 1068 (7th Cir. 1991). The court noted the self-serving nature of the statement and the petitioner's failure to identify "any objective evidence in support of his claim of prejudice." *Id.* The statement alone did not meet the petitioner's burden of establishing prejudice. *Id.*

Here, Kerr points to no objective supporting evidence in the record – no colloquy in the transcripts about his decision-making process, no affidavit or letter from counsel about the impact of the penalty on the decision to reject the offer. But, cannot have an evidentiary hearing in this court because he could have developed the facts in state court but did not. Thus, Kerr is left with his affidavit. While his affidavit is stronger than the petitioner's statement in *Toro*, the court nevertheless finds it insufficient to establish that proceedings

29

actually would have turned out differently if counsel had told Kerr the correct penalty for the class B felony.

4.     Assistance of postconviction and appellate counsel

Kerr adds a new claim in his brief:  ineffective assistance of his appointed counsel in connection with his post-trial motions and appeal for failure to assert that trial counsel was ineffective.  The only deficiencies Kerr cites are the same matters rejected above.

The court need not determine whether Kerr can pursue this post petition claim inasmuch as this court has found that the matters addressed earlier do not constitute ineffective assistance of counsel.  Consequently, postconviction and appellate counsel were not deficient for failing to raise these claims.  In other words, Kerr cannot have been prejudiced by the absence of arguments that would not have changed the outcome of any proceedings.

For the foregoing reasons,

IT IS ORDERED that Kerr's petition for writ of habeas corpus is denied and this case is dismissed.

Dated at Milwaukee, Wisconsin, this 30th day of July, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE